16-20181. I believe you all are all veterans of the argument, but pay attention to the lights and the countdown, and you may proceed. May it please the Court. My name is Bob Renneker, and I'm not a Houston lawyer. I came here from Dallas to argue this case, but it's good to see you. I represent the appellant Patrick Lanier. With me at the council table is a colleague, Jerry Sigmeier, who's helping me with taking notes. The issues that I'm going to argue today are not everything that's addressed in my brief. I've raised 10 points of error, but the argument is going to focus on the first point primarily, whether there was sufficient evidence of Lanier's intent to either join a conspiracy or to aid in a bet in the separate acts of wire fraud. Time permitting, I'm going to discuss the Brady points and the Rule 404 points about the failure to disclose one of the prosecutor's involvement with the other defendant in the case, Butch Ballew, and with her prior law firm, and the cross examination of an extraneous act by her during the trial. Finally, time permitting, I'm going to address the sentencing with the new case that I served on the court on Friday. In this case, what makes this case unique from the ordinary fraud is that Mr. Lanier was a lawyer, and everything that he is charged with doing is practicing law. Throughout this he described Lanier's conduct as drafting various agreements, resolving issues involving a corporation which he essentially undid a transaction with. Is that your position that he was practicing law? That's really the argument that everything was legitimate legal practice? That is correct. Now, there's a side note that Lanier was a little glib in his emails and would send articles that he saw relating to Ballew and Ballew's prosecution. Did he misrepresent Ballew's identity to third parties, and is that part of a legitimate law practice? That is not part of a legitimate law practice, but I don't think that was ever part of any of the transactions. First of all, the only time that Lanier was around other parties was when he was on a boat off of Puerto Vallarta. I think he made, over the course of five or six years, five or six trips down to Mexico. And there's no testimony about what was said during those trips or whether or not any discussions were had about any of this investment. I think the fact that he was referring to Ballew as either John Gilthorpe or Martin Twinley or anybody else only shows that Lanier knew that Ballew was a fugitive. And that's conceded. We all knew that Ballew was a fugitive. And lawyers have a right to represent fugitives. It's not against the law to don't assist the fugitive from escaping justice. Can you assist them with investment-related transactions? Can you assist a fugitive with investment-related transactions that can help them continue to be a fugitive if they can invest their money? I understand, and that gets to the other points that I'm not arguing today, but that I can, which is assisting a federal fugitive and harboring. But even so, I cited cases in the brief that say that a lawyer may continue to assist a client who is a fugitive and may continue to provide representation. So you could give them tax advice on how to manage their money to avoid fraud. I think lawyers do that all the time. And when I've discussed it with Lanier, he keeps talking about Mark Rich. He says, well, look at Mark Rich. Mark Rich was a fugitive in Switzerland until he was pardoned by Clinton. But he needed a pardon. Yeah, but before that he was on the run for a long time and had lawyers assisting him. And if you get to that point, that gets into the aiding and abetting point, not the aiding and abetting point, that gets into the harboring and the assisting a federal fugitive. And to the extent that Lanier did anything that was assisting a federal fugitive, it was not done in the Southern District of Texas. What do you do with that? If we were to agree with you on that, what do we do with the case? Well, it's a two-pronged argument. I'm taking the position in the first point that there is no evidence of criminal intent. The only evidence that we have of what's going on in Lanier's mind is that he knew Ballou was a fugitive. So you've got to address first the criminal intent part. If there was no intent to participate in a fraud, if he was down there because Ballou needed legal assistance to set up real estate deals in Puerto Vallarta or in the Yucatan, then that's one thing. And there's no evidence that he was engaging in criminal conduct or had criminal intent with respect to that. But if you come back and say, okay, we're going to say that there's no evidence of criminal intent, let's turn to the harboring point. Why is he setting up deals, what is the basis of him setting up deals in these other countries as being a lawyer in America? I mean, how is he, if he's not living here and he's not, why is that a legitimate function of an American lawyer? Or a Texas lawyer? I have no idea other than... But I thought you were the one saying it was a legitimate function. Why he was doing it, I don't know. He was not Ballou's sole counsel. And in fact, this transaction had been in existence. Ballou fled in 2004, didn't contact Lanier until 2006. I think Medra and Esau had already been set up prior to that time. I think when Lanier got sucked into this mess, he did so, he got sucked in there to come in and fix the Medra transaction. Okay. Just assuming arguendo, and I'm not foreshadowing, that we did not agree with this argument about that he wasn't part of the conspiracy, but we did agree, and this is just completely trying to figure out how this case works, that the venue was not proper for the harboring. What happens in this case? I'm sorry, you say if you find... That he did participate in, that there evidence, you know, you have a very difficult road to hoe. If there's any scintilla of evidence, I mean, tiny bit of evidence that's not right in this district. Then two counts go away. Just those two counts go away, and then we send it back for resentencing on the... Or not. And there are other reasons to send it back for resentencing. But you have to send it back for resentencing if those go away. And I'm not saying they're going away. I'm just trying to figure out the lay of the land. No, and I would like to The manifest injustice, which is a very difficult standard as well. And I will concede it is a very difficult point to prevail upon. However, when you look at it, everything that Lanier did was the faithful performance of legal services. There is nothing in there that indicated that Lanier was aware of a fraud. And I can address specific points that were raised in the government's argument. If he was legally prohibited from undertaking these financial transactions, then facilitating those transactions would not be a legitimate undertaking of a lawyer. I took a look at the injunction that Judge Atlas had entered against Ballou back in 2003. And I noticed that there were three things that Ballou was specifically enjoined from. He was enjoined from, one, violating the Securities Act. Number two, he was enjoined from violating the Exchange Act. And number three, he was enjoined from promoting securities. Now, I'm not a securities lawyer. I don't profess to be a securities lawyer. And when securities law comes up, my eyes often cross. But there are ways to structure real estate transactions that don't make them promoting securities. And if Lanier has the talent and the skills and the ability to come down there and assist putting together real estate transactions without violating the injunction, I don't think it's improper for him to render his services in that regard. And I don't think that there is an automatic violation of Judge Atlas's injunction. And I understand that that was a real big thing that was out there. And one of the things, the first jury question in this case is, can we see the injunction? And that was sent back. But I don't think there's been any evidence that that injunction was actually violated. Even by Ballou. There's evidence that Meddra Corporation, once it got fixed, was transferred to a Canadian named Vince Saccone, and that Saccone was using that. And I think that that was the majority of the losses, at least for all of the Canadians in this case. And then with respect to the other transaction, the one involving Aztec slash Ultimate Lifestyles, that was for the development of real estate in Puerto Vallarta. Is it legitimate to use fake names to set up companies and do deals? Is that a legitimate lawyer function? I think if you look at the record, if I'm not mistaken, the fake names were, Ballou was not showing up on the records as being an officer, a director, or a promoter. I think his name was showing up as a shareholder of some shares in the corporation. And I think that he was dealing with, he might have been dealing with some people. And yes, that is bad, but I think that really goes to Lanier's knowledge that he was a fugitive, not that he was engaged in criminal conduct. But if he's drafting these documents, it misrepresents who the people are. There's no evidence that he knew who Emily Etal was. Emily Etal was the assumed name or alias for Ballou's wife. There's no evidence that he even had ever met Robin Ballou. But Robert Remington is a fake person altogether, isn't it? I'm drawing a blank on Robert Remington and where that pops up. I think he's ESOL's CEO. And that's not really a person. And the lawyer drafted the agreements for this fake company. I'm going to have to get back to you on that one. I'm totally drawing a blank on that. Maybe I'm confused. But I don't see Ballou's name showing up in any of the documents that he prepared, nor do you see, and let me tell you what Lanier did not do. He did not participate in promoting, offering, or selling any investment. He wasn't out there promoting, offering, or selling. He wasn't talking to any investor. He made no representations to anybody, misrepresentations to any investor or potential investor. He didn't participate in any business or investment decisions of any of the corporations that were involved. And he was paid strictly for his services. He didn't receive any incentives based on the sale of any investment, nor did he have a financial stake in the enterprise. Typically that's what one looks at when you look at somebody joining a conspiracy, is an intent to participate in it. It's kind of like a partnership. You're going to participate in it and you're going to share in the proceeds. That's not what happened in this case. Well, we haven't even talked about the fact that he perhaps thought he was doing something on the edge because he's asking, I'm going to need more because I'm out here on the edge. That's an odd thing to say if you don't realize that there's something wrong going on. I think what you're referring to is the don't put a target on my back. And is that what the court's referring to? When he asked, he said, I'm going to need some additional, you know, the idea that the fees are not legitimate. He's not making enough to be doing what he's doing. No, and here's what's happened. He came back and he saw that he was listed as general counsel for the corporation on the pink sheets. I've represented clients before, and I don't mind showing up as outside counsel and providing outside services, but I don't want to show up as an inside counsel because that indicates that I am a person in control of the corporation. And it's a real big difference from being listed as an inside counsel and being an outside counsel. Well, you saved time for rebuttal, but when you do come back for rebuttal, related to that, you've given a benign explanation, but the jury could take the nefarious explanation too, couldn't they? They could, but I think that would be conjecture and speculation. Good morning, Your Honors. May it please the Court, John Reed on behalf of the United States. Your Honors, I think Judge Elrod hit it right on the head, right at the end there. The problem with opposing counsel's argument is that he fails to look at the evidence in the light most favorable to the verdict and in the light most favorable to the government. Lanier, his actions while they involved the practice of law, facilitated Mr. Ballou's ability to operate under false names and nominee accounts and promoting securities and putting deals together in order to defraud unsuspecting investors. Does it depend on whether we agree that it's actually promoting securities as a matter of law? Does it matter whether we think it's not technically promoting securities? It sounds like a collateral attack on the injunctive order that was granted by Judge Atlas, and this is the first time I'm hearing an argument about that. Is the injunctive order actually part of this judgment that it has to be? It was an exhibit. But you don't need a violation of the injunction to win your case, do you? No, but the fact that he did violate the injunction and Lanier helped him violate the injunction shows criminal intent as part of the conspiracy. Is that part of what you argued to the jury through evidence and through argument that Judge Atlas' injunction had been violated? Absolutely. That's one thing to say in light of how this is going, maybe put that on the table. But wasn't it out in front of the jury? Yes, it was. The injunction was an exhibit that was admitted at trial. I did suggest physically present in front of him, but it seems to me that was a fairly central part of the way the case was presented, that he was barred, he, the client, was barred from doing all this, and here's the defendant lawyer swooping in and helping him violate the injunction. And that's sort of the theory of the case as presented to the jury? I don't disagree with that, Your Honor. That's correct. That was the way the case was tried. So do we need, it seems to me it's a pretty weak support if we in fact don't think there's sufficient evidence to show he was promoting securities or whatever the other two features of the injunction were. Well, as far as promoting securities, I don't think you have to find that he was promoting securities as a matter of law if you find that Lanier did help him to do things like defraud investors. It wasn't just promoting securities. It was structuring deals in a way that Ballew benefited also by not disclosing his prior history, his criminal convictions, and his actual identity. That was part of the fraud as well. So it wasn't just that he promoted securities, which I think he did, and I can go through some evidence if Your Honor wants to hear that. And what I think you have to do is, in the light most favorable to the government and the verdict, look at what Lanier knew. It wasn't just that he knew he was a fugitive. He was a fugitive, and it's true, everyone knew that. But he was a fugitive from a fraud conviction for a stock manipulation scheme. He was wanted by the FBI. He was on the most wanted list. He had been enjoined permanently from promoting securities. And he was accused by the SEC, even after he became a fugitive, of continuing to engage in stock manipulations, and there's evidence cited in the brief that Lanier knew that fact as well. Despite that, communications resumed between Lanier and Ballew in July of 2006. The MEDRA transaction didn't arise until 2007, 2008. July of 2006, communications resumed. September 2006, Lanier sends Garza, the co-conspirator, a draft letter of intent, specifically to be used for selling 1 million shares of restricted stock in ESOL. If that's not promoting securities, I'm not sure what the definition of promoting securities is. In addition to helping him sell stock, he gives him advice like, after reviewing the ESOL marketing materials, don't use words like investor, return on investment, because it's going to bring too much attention to you. And this was around the same time that he's sending emails with links to articles that he says, open this only alone or with Garza. And the link is to an article that says, the FBI is searching for you in Panama. So the FBI is searching for you in Panama, and oh, by the way, don't use words like investment, because that's going to draw too much attention. Mr. Reid, tell me the use you want us to make of what you're just saying. Is that primarily on the harboring aspect, or is it going to criminal intent? But it also does show harboring as well. But I would suggest that the only issue as to harboring is whether venue is sufficient. That's the only thing that's preserved. That's where I saw that emphasized in the briefing, and so I was wondering on your use of it here. It seems to me the principle sense that the jury needed to get, relying on evidence and not speculation, on the underlying criminal intent aspect is that Lanier was assisting him in violating the injunction or in violating the law in some way. Would he have been allowed, would Lanier or any lawyer be allowed to assist somebody who's a fugitive, who has been barred from the three things this fellow wasn't barred from, assisting in legitimate activities, legitimate investment and real estate activities? If Ballou were promoting, well, assuming he wasn't violating the order. I want to see when the crime arose, so I'm trying to start at the bottom. Would he have been allowed to, Lanier, allowed to assist him in legal real estate ventures down wherever he was located? Well, if they were legal real estate ventures. That didn't violate the injunction. That did not violate the injunction, and they were fully disclosed to the potential investors. That is Ballou's background and Ballou's real name. I would have a hard time saying that a lawyer couldn't do that just because he was a fugitive, but that's assuming that all of the actions were legitimate and they weren't. I don't see any dispute from the other side that what Ballou did was a fraud. We're only arguing about Lanier's intent in participating in the fraud. I think it's a given that Ballou was committing a fraud, at least for our purposes of this case. They have not contended otherwise that anything Ballou did was legitimate. So to the extent that Lanier facilitated Ballou's ability to commit that fraud, and the fact that he's a lawyer is completely irrelevant, and it actually was important to his role in the scheme that he was a lawyer, because later on when we got to sentencing, and as Judge Rosenthal found, his use of his legal skills facilitated his ability to help Ballou. But is it legitimate to say, do not say this is stock, do not say this is an investment with this kind of return? To give that advice is to help someone not violate an injunction, isn't it? So that's a helpful, positive role for the lawyer. Except that he's saying don't use those terms because they're going to draw more attention to you, not because it's a correct usage and it will keep you from violating the injunction. And again, at the same time he's saying, oh, and by the way, the FBI is searching for you, be careful. As far as additional, you know, his additional role, take Medra, the other side contends that that's all he did was unwind a stock transaction involving Medra, but from the get-go, Lanier was negotiating with a Maryland attorney who was representing the folks on the other side of that, and he lies to him, the other attorney, about the identity of his client, and he refers to Ballou as John Gell, which he knows is a fake name. He also refers to Ballou as Martin Twinely when he goes to Mexico and meets with Chuck Toopes, who was the investor and principal target in the Ultimate Lifestyle Aztec deal. He lied to Toopes, he lied to Gace, then he lied to Lynn Bolduc, who was a compliance regulatory attorney out in California that he recruited to work on the Ultimate Lifestyle deal, referred to Ballou as Twinely. Bolduc testified that had she known his real identity, she wouldn't have been involved in this. And again, this is all to give the appearance of legitimacy to Ballou's endeavors. Is it correct that he prepared the letter of non-distributive intent for ESOL, and supported it within the document with a fictional document signed by Remington, who is not a person? Did he do that, and did he know that Remington was not a person? He did not prepare the document with Remington's signature. Remington was a fraudulent person. But he did a document that relied upon the document. Did he know that Remington was a fake person? I think you can infer that he did, based on the totality of the circumstances. So he's preparing what purports to be a legitimate legal document for people to rely on that relies on something that he knows is false. That's correct. And I think the Remington signature was on the ESOL financials that were attached to whatever he was sending at that time to Garza. But Lanier's involvement was heavy in so many different areas, and he was, if not, he wasn't the sole attorney, but he was the principal attorney that Ballou keeps running all these documents by, saying, hey, review this, let me know what you think about this. And so Lanier prepared documents, but then he also reviewed and edited many other documents, including getting back to promoting securities, stock subscription agreements and stock option agreements related to ESOL. And he admitted in his own testimony that he knew they were trying to Ballou's interests. He knew he was trying to package stock options related to the property, but he gave an explanation for why he thought that was okay. But the jury didn't have to believe his own explanation. Mr. Peete, my colleagues may want you to get back to that, but with my presider's permission, I'd like to ask you specifically about Counts 16 and 17 and the venue issue that arises from there. But let me start with a ramifications question. I don't remember how this impacted the sentence. Let's say we're a long way from doing this, but speculate that we might do that. To say venue was improper on the harboring, what happens to the sentence? The sentence on Counts 22, or excuse me, 16 and 17 was 22 months. Judge Rosenthal ordered that to run concurrently with the 204-month sentence on the remaining counts. Did it have any impact? It has no impact on the total term of imprisonment. But? But if you were to find venue was improper, I agree with what opposing counsel said, those convictions would be vacated. Why can't we vacate them? You can vacate them. Then do we have to rescind it? No. And the reason is because the only lasting effect would be the $100 assessments that would remain with respect to those counts. This Court can modify the judgment to vacate the convictions, but also vacate the $100 special assessments. And Judge Southwick did just that in a case called United States v. Thomas from 2014. I apologize, I don't have the cite for that. Oh, I do. Okay. Well, then you know what I'm talking about. I could have been wrong. And Judge Southwick, you ruled when you found that harboring convictions were, I don't think it was a venue question, but it was sufficiency. And you vacated those counts and also modified the judgment to remove the $100 special assessments. And this Court affirmed the judgment as modified. So if I lose on that, you do not have to send it back. But, of course, I don't think I lose on venue. Tell me why you shouldn't lose on that. Let's get back to the hearing that Judge Rosenthal had on this. And you made, it seems to me, the same arguments in front of her. The government presented the same five or six, I don't know, the same arguments as to how this fit. And her response, in agreeing with you, is to reject that you ought to look at the e-mail or any particular ones in isolation. There's almost a continuation. And this is not the kind of clean-cut harboring of helping somebody hide physically. It was something else going on. I don't quite know what she meant by that. Was she tying, do you take her ruling to be tying the actions lead supportive of a conspiracy to support Vinyon? I think, well, the answer is that the actions serve dual purposes because of the nature of this offense. Lanier's actions did harbor Ballou. But they also furthered the conspiracy because, I mean, let me put it this way. Lanier could have helped Ballou without harboring him. He could have just prepared various documents. But he was involved in documents that also used false names. And that's the, I think, main point as to harboring is that it allowed him to operate under these false names. And that's what allowed him to remain undetected. Remember, Ballou was a notorious character. And some of the investors testified that they Googled the name John Gell and didn't find anything. So they went ahead and invested. But had they Googled Ballou, the game would have been up. So Lanier's actions, any actions that Lanier took that were a continuation of his efforts to assist Ballou in remaining undetected by using false names, should be sufficient to establish venue if those acts occurred in the Southern District of Texas. And my argument is that the physical acts that he took here in Houston were continuations of what he did elsewhere. Okay, but almost all the acts, it seems to me, that support venue, that are alleged to support venue, are e-mails, correct? The sending of e-mails. Not just the sending of e-mails. I said that that's the primary support. Oh, and you also have the phone call. Yes, yes. Most numerous things are e-mails. You also have a phone call. Yes. And I don't know the technology, but there certainly is a challenge that has some resonance with me that technology doesn't work the way the government says, and we don't have a shown connection to Houston or the Southern District as a result of that. Do you have any response to that? On the phone calls, Judge? On the phone calls. The phone calls, you have to look at the exhibit that was introduced at trial. It's Exhibit 3119. It's the Magic Jack Records, and they show that the proxy host, which is a server, was designated as Houston. So under a preponderance of the evidence, when Ballou was calling the Houston-based number, it was a 281 and a 713 area code, which is Houston, the call was being sent here, and then it was being routed to wherever Ballou happened to be. So our contention is that's a physical act that occurs in the Southern District of Texas, the phone call itself. And, again, as Your Honor pointed out, there were voluminous phone calls. Has any court ever held that that's enough with that kind of technology, a server proxy? That's so happenstance that I can't believe a court has ever said that was enough. I have not found such a case, Your Honor, but there's always a first time. But if the court is uncomfortable with the phone calls. It may well be no rather than yes. It very well may be, but if the court is uncomfortable with the phone calls, you can look at actual documents that were falsely notarized in the Southern District of Texas, and these are discussed in the brief. An Aztec Corporation document was fraudulently notarized in the Southern District of Texas. We know that from the face of the document, stamped by a Harris County notary. It was notarized without a signature. The signature that was added later was the false name Lucy Ito, which was the alias of Ballew's wife. Ito, or someone acting as Ito, sends these documents, yes, judged via e-mail, to Lanier. Lanier also receives them separately from two other e-mail accounts, one from Garza and one from Ballew. But the e-mail that Ito sends, these documents were transmitted by Ito to the stock transfer agent. And in that e-mail, she says, our legal counsel, Pat Lanier, will be in touch with your attorney. So that connects these documents to Lanier, and we know that he actually did physically receive them because they were sent to him. But we also know that Lanier was in contact with the stock transfer agent on multiple occasions in an effort to clear up the relationship between Aztec Corporation and its stock transfer agent. And that was necessary in order for Aztec Corporation to become ultimate lifestyle and begin trading. And so what we have is Ballew maintaining a corporation under the false name Ito, which was his wife, or his wife's alias. And we have Lanier associating with that and taking actions, which the court could find was aiding and abetting a physical act, the notarization that occurred here in Houston. And this is why Judge Rosenthal said this was not a typical harboring case, but rather Lanier's actions were multi-stepped. You have to follow the chain, and granted it's a long one, in finding how does it ultimately get back to helping Ballew operate under false names. Well, Lanier was one of five defendants indicted, the only one who went to trial. Yes. It seems to me one clearer place to have charged the harboring would have been in Austin, Western District. Why was this case here? Would you say that Venue was very clearly correct for the other four defendants and for everything else charged against Lanier? The only Venue issue I'm seeing is on this harboring point. That's correct, Your Honor. Venue wasn't challenged as to any of the other counts, and I do think it was proper here. My time is about to expire. I'll just, if I may finish. It's all right with me. You may continue. Venue was proper as to the conspiracy and wire fraud counts, Venue not being challenged by the other side, but also proper because there was evidence that Ballew, of course, came from Houston, and one of the wires, one of the victims was Paul Hudson, who wired money from the Woodlands, Texas, which is located here in the Southern District of Texas also. So Venue was proper here, and so the harboring counts were added on as well. Thank you. Thank you, Your Honor. Thank you. And you can give an extra minute because they had an extra minute. Before I get into the email, the exposure email, I want to make one comment about Ultimate Lifestyle. That was the situation where, if I recall, ESOL and TOOPS were going to merge their interests, and TOOPS was going to be the person running Ultimate Lifestyle. And one of the legal acts that Lanier did was he referred Ultimate Lifestyle to Len Bolduck, an attorney, I believe, in California, who was going to do the due diligence with respect to that corporation. So I don't think there is anything that ties him in. TOOPS was not an investor, and TOOPS was perhaps the only person that Lanier spoke with that might have known Ballew or Gillithorpe or Twinley or whatever name he chose to use. There is a danger when you look at evidence and you take it out of context. I think of my favorite movie is My Cousin Vinny where the cousin is being interrogated by the police. Do you identify with the lawyer? Pardon? Are you identifying with the lawyer? Absolutely. Absolutely. He says, well, you know, he thought he was being charged with robbery or shoplifting and says, no, you killed a man. He said, I killed a man? And then the police officer testifies at trial. He said, I killed a man. And it's all relating to the tone and it's relating to the context. And when you look at what they refer to as the exposure email, I keep coming back to this, and I think this is where you might have left off, was that he didn't want the exposure of being a general counsel. And Ballew had a habit of bringing people into these deals that they don't really know about and they didn't want to be a part of. Meddra Corporation is a prime example of that. He managed to talk to two Mexican investors, and before they knew it, they were Meddra. And that's why Lanier got involved was to undo Ballew's premature actions of getting somebody else involved in a role they didn't want to have. And with respect to that exposure email, as the government refers to it, I think that was lawyerly common sense on Lanier's part to say, I don't want to be involved in this. I don't want to be listed as general counsel. I'm not assuming that role. I'm not being paid enough to do that. It's kind of like when a client asks me to write an opinion letter. I don't like to do that either. Did you make this argument to the jury? I wasn't present at trial. Was this argument made to the jury? I do not think it was. I don't know what they were doing at trial. Seems like it could have been. And it's up to the jury to accept how to read this. It could have been. It should have been. And if I were trying it, I might have tried it differently. And I might have hammered on lack of intent, lack of intent, lack of intent. Lanier got 17 years for being a lawyer and providing legal services, faithful legal services. We talk about, and I think that you hammered on, or at least picked up on my argument, that when you say don't use in terms like invest, investor, investment, I think that's sound legal advice for somebody who is under an injunction not to do that. And I think that's what Lanier was doing. And I don't know to what extent this Court has already made a determination. There have been a lot of hints, and those always scare me. But I try never to read your mind until I see the opinion. But I would urge you to look at the facts of this case and look at this as what evidence there was that Lanier was doing anything other than providing faithful legal services. I know that he was using, I know that he referred to Ballou by an alias. But he didn't talk to any investors about that. Well, Counsel, speaking for myself, but I think for all three of us, we do come with the ability to be persuaded. But the case, as it appears to me in these arguments, is certainly the support for the government's position here, and the jury bought it, that he was assisting in someone he knew to be a fugitive who was involved in illegal investment scams in this country to continue to hide his identity, to keep investors from knowing who he was, to working on documents and the furtherance of whatever his activities were that kept his identity hidden and allowed him to take an enormous amount of money still from other people. And that kind of sounds criminal. It's my concern. It kind of sounds criminal, and we're all taught that just because somebody runs a stop sign every day of his life doesn't mean that he ran it on the morning that he was involved in a car accident. And just because Ballou had been a criminal in the past doesn't mean that he was going to be a criminal when he was in Mexico. That's an inference. That is a surmise. You've got to have some evidence that what he was really doing was criminal other than hiding under an assumed name. You may have mentioned this before, but Lanier has said to him that he was going to have to get Lorraine to execute a certain document, and Lorraine is the wife, not really Lorraine, and they all knew that. There's no evidence in the record that Lanier knew that. There's no evidence in the record that Lanier ever met Lorraine Etal or Robin Ballou. So he thought there really was a Lorraine. I'm sorry? He thought there really was a Lorraine. As far as I know, he did. And as far as the record shows, he did. And as far as anybody else, I think that's what's my time is up. Thank you for your time.